23CA0810 Peo v Grant 05-22-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0810
Mesa County District Court No. 21CR1611
Honorable Matthew D. Barrett, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Nicole M. Grant,

Defendant-Appellant.

---

ORDER AFFIRMED

Division V
Opinion by JUDGE GROVE
Welling and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 22, 2025

---

Philip J. Weiser, Attorney General, Carmen Moraleda, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Christopher Gehring, Alternate Defense Counsel, Denver, Colorado, for
Defendant-Appellant

¶ 1     Defendant, Nicole M. Grant, appeals the postconviction court's order denying her Crim. P. 35(a) motion to correct an illegal sentence or a sentence imposed in an illegal manner. She contends that the prosecution's evidence was insufficient to support the court's order setting the restitution amount. We affirm.

I.     Background

¶ 2     While working for a medical facility, Grant impermissibly accessed multiple individuals' health records through an online health information exchange provided by a company called Quality Health Network (QHN). As a result of an investigation, the State charged Grant with sixty-four counts of theft of medical records and one count each of stalking and cybercrime.

¶ 3     Grant agreed to plead guilty to five counts of theft of medical records in exchange for the dismissal of the remaining charges and a stipulated probationary sentence. In its victim impact statement, QHN requested $33,400.50 in restitution to cover its legal fees and internal investigative costs that were necessitated by Grant's conduct.

¶ 4     At the providency hearing, Grant pleaded guilty to the five theft of medical records counts and admitted to a factual basis

1

underlying the charges. She requested a hearing on QHN's restitution request. The court sentenced Grant to a controlling term of three years on probation, with thirty days in jail as a condition of that probation sentence. The court then set the matter for a restitution hearing.

¶ 5 At the restitution hearing, QHN's privacy compliance officer testified that four audits were conducted to determine how many patients, medical records, and providers were involved in Grant's impermissible access to the health information. After the audits, QHN concluded that it had to provide notification to eighteen providers and eleven patients who were affected by Grant's conduct.

¶ 6 The compliance officer testified that QHN consulted with legal counsel to determine what steps the company was legally required to take in this situation. The prosecutor offered into evidence the bills from QHN's legal counsel for work related to Grant's conduct. Defense counsel objected, arguing, in part, that the bills were heavily redacted and should be excluded under the rule of completeness. The court overruled the objection and admitted the bills.

¶ 7     During cross-examination, the compliance officer agreed that some of QHN's legal counsel's billed services included consultations with a public relations (PR) firm to help protect QHN's image (PR firm consultation fees).  But she disagreed that the work attributable to the PR firm was different from the legal advice QHN received from counsel.  Throughout her testimony, the compliance officer explained the reasoning behind, and the nature of, the consultations with the PR firm:

- What I can tell you is that the [PR] consultation was required as a result of the egregious work . . . that had gone on. And the fact that the QHN system is used by many providers -- [the] public is aware of it -- and it's important for the health and safety of our patients and our community.

  If there's anything that's affecting QHN's standing in the community, we want to make sure that we're protected and that we reveal this was not a QHN system issue.  It was . . . an impermissible access.  Hence, the purpose of the consultation with the PR firm, advice from counsel was needed.

- The consultation was as a result of the activity that had gone on and the concern that QHN has relative to the protection of all the information and making sure the public knows that we reserve . . . and

secure their information. We wanted to make sure -- and we asked our attorney to speak with this PR firm so that the language that we submit to the public is accurate.

- The reason we inquired for help and requested help with the PR firm is the more that this investigation revealed the impermissible and illegal accesses by [Grant] and the harm that had been caused, we realized it was our system that was used for that purpose, and we wanted to make sure the public would know that we're doing everything we can to protect their information. We weren't quite sure the right way to say that, and which is why we brought in the PR firm.

- QHN is a nonprofit, and our reputation . . . is a big part of the success of our operation in terms of protecting patient information and keeping the public trust, the trust that their records are correct and safe, as well as the obligation we have to our providers and our organizations that send us the information.

We wanted to make sure that we explain everything correctly, that we assure the public. And sometimes, you know, I can tell you that, but it may not make sense to the public, so I needed an expert to help.

¶ 8 The compliance officer testified that working with a PR firm would not have been necessary for a small breach and that the

4

consultations here were required because of the scope of Grant's impermissible access to QHN's service.  Indeed, the compliance officer further testified that the size of the breach was going to require a public notification to the "Office of Civil Rights," and QHN had not previously had to make such a notification.[1]  She also testified that, if QHN ceased to operate, it would result in harm to patients.

¶ 9     The compliance officer acknowledged that QHN's legal counsel redacted their bills and that she did not know the content of the redactions.  Specifically, she was unable to say whether the redacted information involved consultations with the PR firm.  But the compliance officer explained that the redactions were made to protect attorney-client privilege and maintained that the bills were fair and accurate because she had records of the conversations related to the billed services.

¶ 10    Defense counsel moved for the discovery of the unredacted bills to determine whether the redacted services were related to

---

[1] Although not identified by the compliance officer in her testimony, we presume that the Office of Civil Rights referred to a government agency that monitors a medical facility's compliance with privacy laws.

5

legitimate legal advice or to protecting QHN's public interest. The court denied that request.

¶ 11 Defense counsel argued that the PR firm consultation fees were not compensable as restitution and that the prosecution did not meet its burden of establishing that the legal fees associated with redacted information should be ordered. The prosecutor countered that the PR firm consultation fees were not incurred to generate new business for QHN but instead to address the damage Grant caused to QHN's reputation.

¶ 12 In granting the requested restitution, the court concluded that Grant's "extensive breach" was the proximate cause of QHN incurring the PR firm consultation fees. The court found that QHN needed to preserve its reputation in order to continue to operate and that consulting with a PR firm made "sense to help protect the entity from losing business, going out of business, and making it clear to those they work with and the patients' records they have, the patients themselves, that this is a type of thing that would not happen again, was an aberration."

¶ 13 The court further found that the minimal redactions of the legal bills did not impact the veracity or reliability of the documents.

Specifically, the court noted that "[e]ach of these records plainly states where there are redactions and can plainly be seen to show that the fees were associated with this investigation in its entirety."

¶ 14    Subsequently, Grant filed a Crim. P. 35(a) motion, in which she raised challenges to the restitution order that were similar to those raised at the hearing.  The postconviction court denied the motion.  Grant appeals that order.

## II.    Legal Authority and Standard of Review

¶ 15    "A defendant convicted of a felony offense must pay restitution for any pecuniary loss [she] proximately caused [her] victim." *Martinez v. People*, 2024 CO 6M, ¶ 13 (citing § 18-1.3-602(3)(a), C.R.S. 2024); *see also* § 18-1.3-603(1), C.R.S. 2024.  In the restitution context, proximate cause is defined as a cause which in natural and probable sequence produced the claimed injury and without which the claimed injury would not have been sustained. *People v. Dyson*, 2021 COA 57, ¶ 13.  However, restitution does not include, among other things, loss of future earnings.  § 18-1.3-602(3)(a).

¶ 16    Crim. P. 35(a) permits a "court [to] correct a sentence that was not authorized by law or that was imposed without jurisdiction at

any time." A sentence that was not authorized by law, or an illegal sentence, is one that is inconsistent with the sentencing scheme established by the legislature. *People v. Jenkins*, 2013 COA 76, ¶ 11.

¶ 17 Crim. P. 35(a) also permits a court to correct a sentence imposed in an illegal manner within 126 days from, as pertinent here, the imposition of the sentence. Crim. P. 35(a), (b). "A sentence may be imposed in an illegal manner 'when the [district] court ignores essential procedural rights or statutory considerations in forming the sentence.'" *People v. Bowerman*, 258 P.3d 314, 316 (Colo. App. 2010) (quoting 15 Robert J. Dieter & Nancy J. Lichtenstein, *Colorado Practice Series, Criminal Practice and Procedure*, § 21.10 n.10 (2d ed. 2004)). A postconviction challenge to a restitution amount has been treated as an illegal manner claim. *Id.* at 317.

¶ 18 We review the legality of a sentence de novo. *People v. Bice*, 2023 COA 98, ¶ 12. And, "[w]hen the legality of a sentence turns on an issue of statutory interpretation, we review that issue de novo as well." *Id.*

¶ 19    Furthermore, we review a challenge to the sufficiency of the evidence to support a restitution award de novo. *Martinez*, ¶ 19. Finally, we review a court's factual findings for clear error and its legal conclusions de novo. *Id.* at ¶ 24.

### III.    Analysis

¶ 20    Despite framing her argument as a challenge to the sufficiency of the evidence to support the court's restitution order, the substance of Grant's assertions is that the type of damages sought — i.e., the PR firm consultation fees — cannot be ordered as restitution. *See id.* at ¶ 20 ("[W]e consider [a] challenge's substance, not its form."). On this issue, she baldly claims that "protecting QHN's 'image' and ensuring that the 'public doesn't have distrust' . . . is neither a proper basis for nor a proper form of restitution, not only because it's the equivalent of recompensing QHN for 'loss of future earnings' but also because it's 'prophylactic.'" But Grant does not develop this argument any further — by, for example, analyzing the applicable authority and applying to the facts of this case — and we therefore decline to consider it. *See People v. Simpson*, 93 P.3d 551, 555 (Colo. App. 2003).

¶ 21    Grant also appears to argue that, even if PR firm consultation fees can be awarded as restitution, the court's finding that the fees here should be ordered was improperly based on speculation and unreliable evidence.  We are not persuaded.

¶ 22    The compliance officer testified extensively as to the need for the PR firm's services, specifically explaining that Grant's conduct undermined the trust providers and patients placed in QHN to secure the health information.  She also testified as to the reliability and accuracy of the legal counsel's bills.  And, although redacted, the bills themselves provide enough information to demonstrate that the fees were related to work performed related to Grant's impermissible access to QHN's service.

## IV.    Disposition

¶ 23    Accordingly, the order is affirmed.

JUDGE WELLING and JUDGE JOHNSON concur.